**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 14-239 (EGS)** |
| | ) | |
| **CORNELL BARBER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**EMERGENCY**
**MOTION TO REDUCE SENTENCE PURSUANT TO**
**THE COMPASSIONATE RELEASE STATUTE**
**18 U.S.C. § 3582(c)(1)(A)(i)**

Mr. Cornell Barber, through undersigned counsel, respectfully requests that this Court grant him compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) in light of his age (61 years old), and his multiple health issues, including liver disease, thrombocytopenia (a serious blood disorder) and hypertension, which put him at increased risk of death or serious complications from the coronavirus (COVID-19), which has now killed 37 inmates, including 6 inmates at Mr. Barber's facility, FCI Butner Medium I.[1]  As of today, May 2, 2020, the BOP reports that 210 inmates at Butner Medium I were confirmed open positive cases.[2]  The sixth inmate death at Butner Medium I occurred just four days ago.

---

[1]     *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (accessed 5/2/2020 4:32 p.m.).

[2]     *Id.*  As of a little more than a week ago, Thursday, 4/23/20, BOP was reporting only 29 inmate cases at Butner Medium I.  The next day, the number had doubled to 59 cases.  The jump to over 200 cases in the ensuing days is likely attributable to BOP "beg[inning] additional testing of asymptomatic inmates," id., meaning this extreme volume of cases has likely been present undetected at Butner Medium I for some time.

"The COVID-19 pandemic is extraordinary and unprecedented in modern times" and poses a particularly "clear and present danger" to incarcerated individuals. <u>United States v. Johnson</u>, Crim. No. 15-125 (KBJ), ECF 217, Transcript of 4/27/20 at 33. Mr. Barber's age and health conditions put him at great risk of serious illness and death if he contracts COVID-19 and, given the raging infection rate at Butner Medium I, Mr. Barber will almost certainly contract COVID-19 if he remains there. He therefore most respectfully asks this Court to order his immediate release so that he may safely shelter in place with his partner's daughter and her family in D.C.

## BACKGROUND

Mr. Barber was arrested on October 18, 2014, when police found a firearm in his bedroom closet. Mr. Barber admitted the gun was his and was indicted on one count of unlawful possession of a firearm/ammunition by a felon in violation of 18 U.S.C. § 922(g). With counsel for both parties believing that Mr. Barber had at least three ACCA predicates (two of which were for D.C. ADW), the government offered to allow Mr. Barber to avoid ACCA's 15-year mandatory minimum and plead instead to the D.C. Code equivalent of § 922(g) with a binding sentencing range of 10-12 years -- a range beyond the non-ACCA § 922(g) statutory maxiumum of 10 years. Understanding he was subject to ACCA's 15-year minimum, Mr. Barber agreed and on March 6, 2015, entered a Rule 11(c)(1)(C) plea to D.C. Code § 22-4503(a)(1), (b)(1) (2001) before Magistrate Judge Harvey. On June 15, 2015, this Court accepted the binding plea agreement and sentenced Mr. Barber to 12 years in prison.

Eleven days later, the Supreme Court struck down ACCA's residual clause in <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015). On appeal, Mr. Barber contended that, in light of

Johnson, D.C. ADW, with its reckless mens rea, never did qualify as an ACCA "violent felony" and that the entire premise of the binding plea had been erroneous and the result of the parties' mutual mistake.  Mr. Barber's appeal was consolidated for argument with a case in which Judge Boasberg had ruled that D.C. ADW was not a violent felony in light of its reckless mens rea. The D.C. Circuit ruled in that case, United States v. Haight, 892 F.3d 1271 (D.C. Cir. 2018), that ACCA's violent force includes the reckless use of force.  That same day, the same panel affirmed Mr. Barber's judgment in reliance on Haight.  The Supreme Court denied certiorari on February 19, 2019.

Subsequently, the Supreme Court granted certiorari on the reckless mens rea issue in United States v. Walker, No. 19-373, and then (after Walker's death), in Borden v. United States, No. 19-5410.  Currently pending in this Court is a § 2255 motion filed by Mr. Barber on February 18, 2020, that seeks a reduced sentence based in part on the outcome of the legal question before the Supreme Court in Borden.  The government's § 2255 response is due June 8, 2020.

Mr. Barber has been incarcerated for over 66 months and has over 8 months of earned good time credits, for a total of approximately 75 months of credited time.  His projected release date is 60 months away – May 7, 2025.  In the normal course, inmates finish up to the last year of their sentences in a halfway house and/or home confinement such that, in reality, Mr. Barber is facing approximately 48-54 more months in prison.

## APPLICABLE LEGAL PRINCIPLES

In the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons.  Prior to this amendment, the BOP was the sole entity

allowed to file such a request.  Now, a defendant may file such a motion "after the defendant has

fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the

warden of the defendant's facility, whichever is earlier[.]"  Id.

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of

imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they

are applicable, if it finds that—"

(i)     extraordinary and compelling reasons warrant such a reduction; or

(ii)    the defendant is at least 70 years of age, has served at least 30 years in
        prison, pursuant to a sentence imposed under section 3559(c), for the
        offense or offenses for which the defendant is currently imprisoned, and a
        determination has been made by the Director of the Bureau of Prisons that
        the defendant is not a danger to the safety of any other person or the
        community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by
the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the

First Step Act and has not been amended to account for the statutory changes to § 3582.

Accordingly, courts have held that "the most sensible interpretation of the Sentencing

Commission's guidance in light of Congress's recent statutory amendments is that 'the

Commission's existing policy statement provides helpful guidance on the factors that support

compassionate release, although it is not ultimately conclusive.'"  United States v. Bucci, 409 F.

Supp. 3d 1, 2 (D. Mass. 2019) (quoting United States v. Fox, No. 2:14-cr-03-DBH, 2019 WL

3046086, at *5 (D. Me. July 11, 2019)); see also United States v. Beck, No. 1:13-cr-186-6, 2019

WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful

guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction may be warranted if "the court determines that—"

(1)     (A)  extraordinary and compelling reasons warrant the reduction; or

        (B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2)     the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3)     the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Under Application Note 1(A)(ii), "extraordinary and compelling reasons exist" when the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process" "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."   Per Application Note 1(D), a sentence reduction may also be warranted for "[o]ther [r]easons," such as where "there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with," his medical condition and/or age.[3]

> Application Note 2 provides:
>
> [A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

Application Note 4 recognizes that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction."  Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances."  Beck, 2019 WL 2716505, at *8.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION TO DECIDE THIS MOTION.

On January 6, 2020, Mr. Barber submitted an "Attempt at Informal Resolution (Request for Administrative Remedy)" stating:  "ISSUE PRESENTED:  In accordance with the amended requirements set forth by the FIRST STEP ACT of 2018, I am now eligible for refferal [sic] to be made to the Federal District Court recommending a compassionate release on my behalf. This is based upon Title IV of the FIRST STEP ACT under 18 U.S.C. §3582(c)(2)(i). RESOLUTION SOUGHT:  I am seeking to be evaluated, and recommended for a modification of my current sentence to the Federal District Court based upon the finding that I do in fact meet those amended requirements."  Regarding actions taken to resolve the matter informally, the

---

[3]     To the extent that Application Note 1(D) restricts "other reasons" to those "as determined by Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply.  See United States v. Cantu, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019).  Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." Beck, 2019 WL 2716505, at *9.

counselor wrote, "Inmate advised to submit requests for compassionate release to BUT RIS" and checked the box for "Problem not resolved," noting, "Inmate stated he submitted an electronic request to the BUT RIS but with no response."  The Unit Manager's signature is dated 1/8/20.

On January 23, 2020, Mr. Barber submitted a Form BP-229(13) ("Request for Administrative Remedy") , assigned "Case Number: 1003967-F1," stating:  "In accordance with the FIRST STEP ACT of 2018, and the expanded requirements for seeking a commpassionate [sic] release referal [sic] to be made to the federal district court on my behalf, I am once again requesting to have my request addressed properly.  Under Title IV of the FSA, the district court has the jurisdiction to modify a sentence based upon exstordinary [sic], or compling [sic] basis. The authority given to the federal district court may be found under Title 18 USC §3582(c)(2)(A)."

Although his citations are not exactly correct, it is clear that Mr. Barber was asking BOP to make a compassionate release motion with this Court due to "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i).

 On January 29, 2020, someone acting on behalf of "B. Sullivan, Warden" responded to Mr. Barber's request "1003967-F1, receipted January 23, 2020, in which you claim you are eligible for a compassionate release, based on the Home Confinement Pilot Program for Elderly Offenders criteria under the First Step Act."  The response denied the request, concluding Mr. Barber was ineligible for the home confinement program for elderly offenders because he had a prior conviction for a crime of violence (D.C. Code manslaughter) and because his recidivism risk assessment was listed as "medium."  It does not appear that Mr. Barber appealed further.

On April 22, 2020, counsel submitted an e-mail to Butner Medium I again seeking a compassionate release referral for "extraordinary and compelling circumstances" under

§ 3582(c) and setting forth specifically Mr. Barber's age and the medical issues rendering him at

risk for severe illness or death in light of the COVID-19 pandemic and the sickness and death

already experienced within Butner Medium I.   On April 23, 2020, counsel received a response

indicating her request had been sent to the appropriate department for review.

Section 3582(c)(1)(A) allows a defendant to file a compassionate release motion on his

own behalf after he "has fully exhausted all administrative rights to appeal a failure of the

Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days

from the receipt of such a request by the warden of the defendant's facility, whichever is

earlier[.]"  Thirty days have now passed since Mr. Barber filed his Request for Administrative

Remedy.  Although he received a response related to his eligibility for a home confinement

program,  his request for a compassionate release referral has never been addressed.  Thus, 30

days having passed, this Court may properly consider this compassionate release filed by Mr.

Barber on his own behalf.

Even if this Court were to find exhaustion unsatisfied, exhaustion is non-jurisdictional

and may be waived.  See United States v. Jennings,  Crim. No. 18-17 (TSC), ECF 30 at 2-4

(D.D.C. April 22, 2020) (waiving exhaustion requirement in light of inadequacy of

administrative remedies, irreparable injury absent judicial review, history of the compassionate

release statute, and urgency of COVID-19 pandemic).  See also United States v. Ghorbani, Crim.

No. 18-255 (PLF), ECF 129 at 2 (D.D.C. April 3, 2020) (government acknowledging in joint

filing that "a Court can dispense with the [§ 3582(c)(1)(A)(i)] administrative exhaustion

requirement where, as here, there are 'exceptional circumstances of peculiar urgency . . .'").

Exhaustion was particularly futile in this case.  As explained by Chief Judge Howell in

United States v. Hammond, Crim. No. 02-294 (BAH), ECF 51 (D.D.C. April 16, 2020), there

exists a federal regulation and a BOP Program Statement stating that BOP lacks authority to

initiate § 3582(c)(1)(A) requests on behalf of "'D.C. Code offenders confined in federal

institutions.'" Id. at 10-11 (quoting regulation and Program Statement).   The government in

Hammond interpreted this regulation as applying even to D.C. Code offenders sentenced in

federal court, like Mr. Barber.  Id.  Thus, any appeal of the warden's denial of Mr. Barber's

request for a compassionate release motion would have been futile and any failure to exhaust

should be excused.  See also Johnson, Crim. No. 15-125 (KBJ), ECF 217 at 30-31 (exhaustion

not jurisdictional and, to extent it was not satisfied, was excused as futile given BOP's stance

that it could not move for compassionate release until defendant was placed in its custody).

Regardless of whether BOP actually lacks authority to seek § 3582(c)(1)(A)

compassionate release for D.C. Code offenders convicted in federal court, see Hammond, Crim.

No. 02-294 (BAH), ECF 51 at 12-13 (suggesting alternative reading of BOP's authority), federal

judges certainly do have authority to grant such compassionate release motions filed by

defendants they have sentenced under the D.C. Code.   Id. at 13-16 (granting compassionate

release over government contention that court lacked authority because defendant was serving

D.C. Code portion, not federal portion, of federal court's sentence).[4]

---

[4]   Alternatively, this Court could grant Mr. Barber compassionate release under the District of
Columbia's own recently-enacted compassionate release provision, which allows D.C. Code
offenders to bring their own motions and has no exhaustion requirement.  See D.C. Code § 24-
403.04 (emphasis added):

(a) …[T]he Court may modify a term of imprisonment imposed upon a defendant if it determines
the defendant is not a danger to the safety of any other person or the community, pursuant to the
factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's
rehabilitation while incarcerated, and
    (1) The defendant has a terminal illness, which means a disease or condition with an end-
of-life trajectory;
    (2) The defendant is 60 years of age or older and has served at least 25 years in prison; or
    (3) Other extraordinary and compelling reasons warrant such a modification, including:

II.     **THIS COURT SHOULD GRANT MR. BARBER COMPASSIONATE RELEASE
        BECAUSE OF HIS MULTIPLE CO-MORBIDITIES AND HIS HEIGHTENED
        RISK OF SERIOUS COMPLICATIONS OR DEATH FROM COVID-19.**

"The government acknowledges that the risk of COVID-19 for vulnerable inmates will be

weightier in institutions that have suffered severe COVID-19 outbreaks . . . ." Jennings, ECF 27

at 12.  Here, the risk could not be weightier.  With 210 open positive inmate cases, and only 860

inmates, 24% of Butner Medium I inmates are currently infected with COVID-19.   An inmate

from Mr. Barber's 25-person "pod" died on April 11th and three more from the institution died

over the next two days.  There was another death on April 16th.  Just four days ago, a 73-year-old

man became the latest Butner Medium I resident to succumb.  Although it houses less than one-

half of one-percent of BOP's population, Butner Medium I accounts for 6 of the 37 total deaths

across BOP.

As to Mr. Barber's specific vulnerabilities, his unit team assisted with the mailing of his

medical records on Monday, April 26th, but they have not yet arrived.  Given the urgency of this

---

(A) A debilitating medical condition involving an incurable, progressive illness,
or a debilitating injury from which the defendant will not recover;
(B) Elderly age, defined as a defendant who is:  (i) 60 years of age or older; (ii)
Has served at least 20 years in prison or has served the greater of 10 years or 75% of their
sentence; and (iii) Suffers from a chronic or serious medical condition related to the aging
process or that causes an acute vulnerability to severe medical complications or death as a result
of COVID-19;
(C) Death or incapacitation of the family member caregiver …; or
(D) Incapacitation of a spouse….

Although Mr. Barber has not yet served 75% of his sentence and has not served 10 years, the
four examples of "extraordinary and compelling reasons" listed at (A) through (D) are explicitly
not exhaustive and, with credit for more than half of his sentence and otherwise meeting the
"elderly age" definition in example (B), Mr. Barber suggests that his reasons for seeking
compassionate release, considered as a whole, qualify as "extraordinary and compelling" under
this D.C. statute as well.

matter, counsel is proceeding based on the information she has, and will supplement with additional information as it arrives.

Mr. Barber is 61 years old.  According to his PSR, Mr. Barber has a scar from a chemotherapy port that was installed in 2009 while at FMC Springfield.  Per the PSR, Mr. Barber said he received chemotherapy to treat a blood disorder called "thrombocytosis," with which he was diagnosed in the mid-1980s.  PSR ¶ 52.  The PSR writer footnoted that thrombocytosis is a disorder in which your body produces too many platelets (thrombocytes), which play an important role in blood clotting.  The PSR later notes that records from the D.C. Jail Medical Department reflect a diagnosis of "thrombocytopenia."  Thrombocytopenia is a blood disorder in which the sufferer has too few platelets, resulting in an impaired clotting ability (coagulopathy).  The jail records also documented a splenectomy in 1983 (PSR ¶ 55), removal of the spleen being a common treatment for thrombocytopenia.  Based on information from Mr. Barber, counsel understands that he suffers from thrombocytopenia, not thrombocytosis.  As will be discussed below, these blood disorders are related and both appear to put a person at special risk of severe illness or death from COVID-19.

The PSR further noted that Mr. Barber suffers from Hepatitis C, which he believed he may have contracted during a blood transfusion he received in 1983 or 1984 to treat his blood disorder.   PSR ¶ 54.  The jail medical records confirmed both Hepatitis C and liver cirrhosis. PSR ¶ 55.

According to Mr. Barber's 11/27/19 Progress Report, he arrived at Butner on 4/12/16 "for medical treatment."  Per his 1/16/20 Program Review, his care assignment level is "Care 3 – Unstable, Complex Chronic Care" and he is "medically unassigned" for work.  His 11/27/19 Progress Report states that "[h]e has medical issues that require regular visits with medical

staff." Mr. Barber reports that he is on medication for several of his conditions, including hypertension.

As set forth below, all of this puts Mr. Barber at high-risk of severe illness or death if he were to join the almost one in four inmates at Butner Medium I who now have COVID-19.

According to the CDC, "[a]ge is strong risk factor for severe illness, complications, and death."[5] Indeed, the CDC warns that people aged 65 and older are all "at high-risk for severe illness from COVID-19."[6] According to the CDC Clinical Guidance, the case fatality rate increases dramatically with age and among 44,000 cases in China, people in their 60s, like Mr. Barber, were about three times as likely to die of COVD-19 as people in their 50s and nine times as likely as people in their 40s.

But age aside, the CDC warns that "[p]eople of all ages with underlying medical conditions" are "at high-risk for severe illness from COVID-19." CDC Higher Risk Groups. Experts are only starting to understand all the ways in which COVID-19 attacks its victims and damages its varied organs and systems. Clinicians are now recognizing that it does not simply "clo[g] the tiny air sacs in the lungs, choking off the body's oxygen supply," but may also cause "heart inflammation, acute kidney disease, neurological malfunction, blood clots, intestinal damage and liver problems."[7] For this reason, a wide variety of underlying medical conditions put victims at risk of being in that category of patients unable to withstand the virus's assault.

---

[5]     *See* CDC, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html ("CDC Clinical Guidance").

[6]     *See* CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html ("CDC Higher Risk Groups").

[7]     Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere,* Washington Post (Apr. 15, 2020),  (Cont'd)

Among the underlying medical conditions the CDC has singled out for high-risk is "chronic liver disease."  CDC Higher Risk Groups.  Mr. Barber's D.C. Jail medical records confirmed both Hepatitis C (which he believed he had acquired in the mid-1980s) and liver cirrhosis.  PSR ¶ 55.  Addressing those with "[c]hronic liver disease, including cirrhosis," the CDC explains:  "Severe illness caused by COVID-19 and the medications used to treat some severe consequences of COVID-19 can cause strain on the liver, particularly for those with underlying liver problems."  Id.  Moreover, "[p]eople living with serious liver disease can have a weakened immune system, leaving the body less able to fight COVID-19."  Id.

It appears that Mr. Barber's thrombocytopenia also renders him especially vulnerable to this disease.  Although not yet fully understood, scientists hypothesize that at least some of the strange clinical courses they are observing "may be explained by severe changes in patients' blood."  See Ariana Eunjung Cha, *A mysterious blood-clotting complication is killing coronavirus patients*, Washington Post (April 22, 2020) https://www.washingtonpost.com/health/2020/4/22/coronavirus-blood-clots (reporting 20-40% of patients are developing clots even while on anticoagulants; "[a]utopsies show some people's lungs fill with hundreds of microclots;" dialysis machines are clogging with clots and "jammed several times a day;" head of Society of Critical Care Medicine explaining that people with normal clotting complications "don't clot like this" and "we are scared;" many doctors have "c[o]me to believe the clots might be responsible for a significant share of U.S. deaths from covid-19 – possibly explaining why so many people are dying at home;" researcher expressing

---

https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html.

belief that blood complications are "one of the top three causes of demise and deterioration in covid-19 patients.").

"Blood clots . . . appear to be the opposite of what occurs in Ebola, Dengue, Lassa and other hemorrhagic fevers that lead to uncontrolled bleeding.  But they actually are part of the same phenomenon."  Id.  When the body undergoes a trauma, "the blood can overreact, leading to an imbalance that can cause excessive clots or bleeding – and sometimes both" – that is called "hemostatic derangement."  Id.  "One of the theories is that once the body is so engaged in a fight against an invader, the body starts consuming the clotting factors, which can result in either blood clots or bleeding."  Id.   Some medical centers have begun giving all patients blood thinners and upping doses for the most seriously ill but this risks "upsetting the balance in the other direction and having the patient bleed to death."[8]   See also G Lippi et al., *Thrombocytopenia is associated with severe coronavirus disease 2019 (COVID-19) infections: A meta-analysis* (March 13, 2020) , https://www.ncbi.nlm.nih.gov/pubmed/32178975 ("CONCLUSIONS:  Low platelet count is associated with increased risk of severe disease and mortality in patients with COVID-19, and thus should serve as a clinical indicator of worsening illness during hospitalization."); American Society of Hematology, *COVID-19 and Coagulopathy: Frequently Asked Questions* (April 14, 2020), https://www.hematology.org/covid-19/covid-19-and-coagulopathy (discussing "COVID-19-associated coagulopathy (CAC)" and fact that some patients with severe COVID-19 can develop a coagulopathy meeting criteria for disseminated intravascular coagulopathy (DIC), which is reflected, among other things, by moderate to severe thrombocytopenia; citing study in which

---

[8]    A common complication of severe COVID-19 is gastrointestinal bleeding.   See CDC Clinical Guidance.

71% of "non-survivors" from COVID-19 met the DIC criteria compared to 0.4% of survivors).

Although it is impossible to say exactly how Mr. Barber's thrombocytopenia would affect him if

he were to contract COVID-19, if doctors are "scared" of the blood disorders caused by COVID-

19 in people *without* a pre-existing blood disorder, we should be very scared for someone like

Mr. Barber whose hemostatic balance is already dangerously askew.

High blood pressure (hypertension) is a cardiovascular condition that "forces the heart to

work harder to deliver blood to the body" and over time thickens the left ventricle and weakens

the heart muscle, which to can lead to heart attack or heart failure.[9]  Thus, under the high-risk

category of "[s]erious heart conditions," the CDC warns that "[p]eople with hypertension should

continue to manage and control their blood pressure" by taking their "heart disease medications

(such as those to treat . . . high blood pressure)" as directed.  CDC Higher Risk Groups.

"COVID-19. . . can make it harder for your heart to work" and "[f]or people with . . . serious

heart conditions this can lead to a worsening of COVID-19 symptoms."  Id.  The CDC Clinical

Guidance notes that in China hypertension was associated with "increased illness severity and

adverse outcomes," including a case fatality rate more than six times higher than for those

without underlying medical conditions.   The CDC recently reported that, of those hospitalized

COVID-19 patients with known underlying conditions, 50 percent had hypertension.[10]   Cf.

Hammond, Crim. No. 02-294 (BAH), ECF 51 at 17 ("defendant has also been diagnosed with

---

[9]      Mayo Clinic, *High blood pressure dangers:  Hypertension's effects on your body*, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868.

[10]     Shikha Garg et al, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, CDC (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm ("CDC Morbidity and Mortality Weekly Report").

hypertension, Hepatitis C, both serious medical conditions in their own right"); <u>Johnson</u>, Crim. No. 15-125 (KBJ), ECF 217 at 35-37 (granting compassionate release in part based on diagnosis of hypertension).

The spleen "prevents infection by producing white blood cells (lymphocytes) and acting as a first line of defense against disease-causing organisms."[11]  Thus, without a spleen, Mr. Barber is immunocompromised, which the CDC has indentified as another COVID-19 high-risk factor for people of all ages.  CDC Higher Risk Groups.  And it now appears that Mr. Barber's immune system may be at an additional disadvantage due simply to his gender.  <u>See</u> Maggie Koerth, *Why Are More Men Than Women Dying of COVID-19?* (April 30, 2020), https://www.fivethirtyeight.com/features/why-are-more-men-are-dying-of-covid-19/ (quoting professor of demography and population health:  "So far, the mortality disadvantage for men is quite large.").  Sex hormones and sex chromosomes appear to play a role:  "Estrogens amp up the immune system, while androgens (like testosterone) and progesterone suppress it" and the immune-boosting genes on the X chromosome "tend to be expressed more frequently in women," who have two X chromosomes, not one.  <u>Id,</u>

Any one of these factors alone might cause only a modest increase in Mr. Barber's risk of severe illness.  But multiplied together, these co-morbidities combine and reinforce each other to render COVID-19 a uniquely dangerous threat to Mr. Barber.  As has been well-reported, while many COVID-19 victims recover on their own, those whose illness progresses to severe or critical collapse in dramatic fashion.   Given Mr. Barber's underlying conditions, he is at great

---

[11]     Mayo Clinic, *Enlarged spleen*, https://www.mayoclinic.org/diseases-conditions/enlarged-spleen/symptoms-causes/syc-20354326.

risk of being in that category.  The CDC Clinical Guidance puts the death rate for those with critical illness *between 39% and 72%.*

And most relevant right now: unlike most of us, and unlike even most BOP inmates, Mr. Barber is, due to his placement at Butner Medium I, at extreme and constant risk of contracting this virus.  The disease is rampant.  Mr. Barber lives in a pod of 25 inmates, sharing three sinks, two toilets, one urinal, and four telephones (3' apart).  He shares a cubicle with an inmate whose bunk is approximately 3' from his.  An inmate from Mr. Barber's pod, Charles Rootes, has already died.

The CDC's Morbidity and Mortality Weekly Report directs that "older adults and persons with serious underlying medical conditions should avoid contact with persons who are ill." Thus, for Mr. Barber, "self-care" of his conditions requires that he protect himself from contact with COVID-positive inmates, the air they breathe, and the surfaces they touch.  With at least a quarter of the population infected, including some who are presymptomatic or asymptomatic, and social distancing and complete hand hygiene impossible, Mr. Barber simply cannot avoid such contact at Butner Medium I.   In this way, Mr. Barber's "serious physical or medical condition" -- which is permanent, i.e., "from which he . .  is not expected to recover" -- "substantially diminishes [his] ability . . .  to provide self-care within the environment of a correctional facility."   U.S.S.G. § 1B1.13, comment. n.1(A)(ii)(I).  See Johnson, Crim. No. 15-125 (KBJ), ECF 217 at 36 ("[I]t is clear to this Court that a high-risk inmate will face challenges in caring for himself in prison when it comes to protecting himself from this virus or exercising self-care if he contracts it.").  Left at Butner Medium I, Mr. Barber will almost certainly become infected and, given his fragile medical state and the myriad fronts on which this virus attacks its victims, he is in real danger.

"These are not normal times[.]"  United States v. Gonzales, 2020 WL 1536155, at *3

(E.D. Wash. Mar. 31, 2020) (granting compassionate release to 60-year old defendant with

underlying health condition).  The extreme infectiousness of COVID-19, the truly frightening

amount of sickness and death to which Mr. Barber is currently exposed at Butner Medium I, and

the higher mortality risk he is facing in light of his age and medical vulnerabilities, make clear

that extraordinary and compelling circumstances warrant a sentence reduction in this case.  Mr.

Barber respectfully requests that the Court exercise its discretion to grant him immediate release.

### III.    MR. BARBER IS NOT A DANGER TO THE COMMUNITY AND ANY CONTINUED INCARCERATION WOULD BE GREATER THAN NECESSARY TO ACCOMPLISH THE GOALS OF SENTENCING.

Mr. Barber's release would not pose a danger to the community but rather would protect

the staff and inmates of Butner by reducing its population and would protect the community by

greatly reducing the risk that he will require hospitalization, which would only further strain the

limited medical resources that the public at large is so dependent upon at this perilous moment of

national emergency.

The § 3553(a) factors also support compassionate release.  Having been incarcerated

since October 2014 (75 months with earned good time), Mr. Barber has been significantly

punished.  The fortuitous increase in the *severity* of his confinement caused by this viral threat

alters the *length* of confinement necessary to "provide just punishment" under § 3553(a).   See

Johnson, Crim. No. 15-125 (KBJ), ECF 217 at 43 (release appropriate for defendant who had

served one year of 41-month sentence: "[W]hile the severity of the defendant's conduct remains

unchanged, what has changed is the environment where the defendant is serving his sentence,

insofar as the sentence that the court previously imposed did not include incurring a great and

unforeseen risk of severe illness and death brought on by a global pandemic.  That is the

circumstance that the Court must take into consideration today."). Cf. United States v. Smith, 27 F.3d 649, 655 (D.C. Cir. 1994) (departure warranted where there is a substantial fortuitous increase in the severity of confinement unrelated to the defendant's "just deserts").

Although Mr. Barber has a serious criminal history, and spent much of his life incarcerated, upon his release from prison in 2011 he went to work for the Capitol Riverfront Business Improvement District, where he did extraordinarily well. As detailed in a letter from his supervisor (ECF 25-1), after starting as a Clean and Safe team member, Mr. Barber was promoted to hospitality ambassador, responsible for greeting commuters at the Navy Yard Metro and earning a commendation for his courage and quick action in apprehending a cellphone thief (ECF 25-2). Ultimately, he was promoted to team supervisor: "Cornell is a great guy to work with and despite his past he was able to influence others in a positive way."

In Hammond, Chief Judge Howell recognized that "the nature and circumstances of [Hammond's] offense" were serious (he had struck his armed robbery victim with a clothing rack, placed a gun to his head, and pulled the trigger twice) and that aspects of his "history and characteristics" were "indisputably troubling." Hammond had been sentenced to 355 months in prison, just under 30 years. He had served 18 years (20.5 years with good time). But Judge Howell looked to Hammond's more recent conduct and granted him compassionate release, concluding that, although his Warden had found Hammond's release would present an "undue risk to the community," his lack of disciplinary incidents was commendable and that, given all the circumstances, a sentence of 20.5 years was adequate to meet the goals of the factors set out in § 3553(a).

Mr. Barber respectfully asks this Court to find a similar result appropriate here. According to his 11/27/19 Summary Reentry Plan Progress Report, Mr. Barber has "maintained

clear conduct" throughout service of this Court's sentence and "is not a management concern at this time." He has paid his special assessment, completed the non-residential drug treatment program and various educational classes, and maintained family ties, having had a happy visit from his partner and her grandchildren shortly before the pandemic put an end to visitation. Per his 1/16/2020 Individualized Reentry Plan Program Review, he has no discipline reports and is scheduled for Second Chance Act Review in 41-43 months. Mr. Barber will be on strict conditions of supervision upon his release for a period of three years (Judgment, ECF 32).

Although Mr. Barber agreed to accept a binding sentencing range of 10-12 years, and acknowledges that this Court's 12-year sentence was reasonable in light of his history, he submits that a lesser sentence would now be sufficient to serve the purposes of § 3553(a). As explained in his § 2255 motion, Mr. Barber agreed to a sentencing range over the § 922(g) 10-year statutory maximum because he was unaware Johnson was pending and both parties understood him to be ACCA-eligible. The Supreme Court in Borden may soon render that understanding wrong and render this Court's mens rea ruling in United States v. Brown, 249 F. Supp.3d 287 (D.D.C. 2017), prescient. If it turns out that Mr. Barber was never actually ACCA-eligible, the original § 922(g) charge in fact exposed him to only a maximum of 10 years and a guideline range of 70-87 months. See ECF 43 at 20 n.8.[12] Given this Court's ruling in Brown, it is not unreasonable to think that a non-ACCA 70-87 month sentence is where Mr. Barber could have ended up if the Court had been made aware of all the facts at the time it agreed to accept the parties' binding agreement.

---

[12]     Mr. Barber's guideline range on the D.C. Code offense to which the government allowed him to plead instead started at only 42 months. PSR ¶ 80.

For all these reasons, Mr. Barber submits that a time-served sentence – that is, a sentence of effectively 75 months – does adequately serve the purposes of sentencing and that, in light of the extraordinary and compelling reasons justifying his immediate release from Butner Medium I, a sentence any longer than that would now be greater than necessary to serve those purposes.

## IV.    MR. BARBER'S RELEASE PLAN.

If released, Mr. Barber will live with Lawanda Henderson, who is the daughter of his long-time partner and who he considers his daughter.  Counsel has spoken with Ms. Henderson, age 37,  and she would welcome Mr. Barber to shelter with her and her four children, ages 18 (currently home from college), 14, 12 and 3, at her home on 7th Place N.E.  Ms. Henderson works as a special police office, patrolling in her personal vehicle as private security for a residential area, and is able to protect herself from the virus while on the job.  Mr. Barber will be very safe in her home.  He will be able continue his medical care through Unity Healthcare, the community health provider for D.C. residents with no income.

Because of his intention to self-isolate upon returning to the District, Mr. Barber requests that this Court amend his conditions of supervised release so that he need not report in person to the Probation Department, and to instead allow him to contact the Probation Department by telephone within 72 hours of his release.

## CONCLUSION

For the foregoing reasons, Mr. Barber respectfully requests that this Court decide his motion on an emergency basis and that the Court grant his motion and order his immediate release.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
LISA B. WRIGHT
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500